Case number 20-12-46 Kelly Rhodes v. State of Michigan et al. Oral argument not to exceed 15 minutes per side. Mr. Cabot, you may proceed for the appellant. Good morning, your honors. May it please the court, Sean Cabot appearing on behalf of the appellant Kelly Rhodes. At this time, I'd like to reserve three minutes for rebuttal. As the court is aware, there are three primary issues that we're asking the court to rule on and reverse the decision of the district court. One, the appellant argues that the district court erred in dismissing the plaintiff's eighth amendment claims as the defendant McPherson. He's the one who prematurely lowered the lift gate. We argue that the district court also erred in dismissing the eighth amendment claim as the defendant Jones who was the truck driver and the laundry cart flinger when he literally flung a nearly 400 pound laundry cart at the plaintiff causing the injury. And thirdly, we argue that the district court erred in dismissing the 14th amendment state created danger claims where it was clear that the actions were really inaction to both defendants Jones and McPherson resulted in significant injuries of a traumatic brain injury and numerous other significant injuries and damages. Mr. Cabot, I'm sorry, and hopefully Judge Moore will give you 30 seconds. Mr. Farrell, will you mute your... It's not muted. It muted and then it went off. I'm getting a lot of feedback. I don't know if Okay, that's much better. Okay, go ahead. I'm sorry, Mr. Cabot to interrupt you. No problem, your honor. I'll be fine. I know the court has read the pleadings and the filings and are familiar with the facts. But I do want to make sure that I point out a couple of facts that I believe are important in that set this case apart from some of the other cases. Number one, Miss Rhodes was 51 years old at the time this incident occurred. She stood five foot four inches tall and she weighed 160 pounds. So she was not a young woman and she certainly wasn't a large woman. And that becomes especially important when you consider that these laundry carts are on wheels, they can be over six foot tall, and that they can weigh three to 400 pounds. So obviously, these carts loaded with dirty laundry can be taller than she was and can weigh twice or even a little more than she weighed. Do we know the facts indicate what the weight of this laundry cart was? They do not specifically throughout discovery. I mean, obviously, there was never any investigation done to weigh the actual cart that fell. But the general consensus with the testimony by the corrections officers, and everybody involved seemed to be that the laundry carts were about three to 400 pounds. At the very minimum, I believe there's testimony. At the very least, they would weigh 50. Mr. Kavik, can I can I ask you a couple background questions on that? How did she get the laundry detail job? So my understanding is, is that it's a voluntary position. And so I'm not 100% sure, but it would seem to be you could sign up for it. I know that there was criterion, because it was termed, I think it was called a gate pass position, that you had to obviously have exhibited good behavior. You obviously couldn't be a flight risk, those types of things. And so we know all those calculations were taken into consideration. She wasn't deemed a person who they thought would be a risk, or thought would be a type of flight. Are these the types of prisoners that jobs that they pay for? Or are they just gate pass jobs? Because you a lot of go ahead. I'm sorry. No, I'm sorry. I interrupted that. I don't know, Your Honor. I know this was a gate pass job. Whether or not she was paid, I don't know that that was brought out through the discovery in the case. And one other question, what were her job duties? Well, basically, it was to assist in unloading and loading the laundry carts onto the basically the 18 wheel semi truck. And she was at an all women's prison. And there's only one of those in Michigan. And that was that they would bring the semis in, they would unload the laundry carts and load them back up. And was there any indication in the record about training that she had? According, according to the record, she didn't receive any training from any officials. There was very little, I guess, on the job training, essentially, by the fellow inmate that was with her. And again, this was only her second day on the job. There's no indication that there, you know, sometimes in a workplace, traditional workplace, you know, you watch safety videos, or you read safety pamphlets, things like that. No indication at all in the record that anything like that was done, nor any indication that the officials here, or any officials otherwise took these individuals, separated them, gave them any type of significant, or really any type of training at all. If you had to point to the best evidence in the record to show that Jones and McPherson were deliberately indifferent, what would you point to? Well, I would point to their own testimony. Their own testimony, and then I'm going to pull it up here. But specifically, what did they do that showed deliberate indifference? Well, first of all, as to Jones, I mean, the record clearly established that he was already behind schedule. Everybody knew that these laundry carts were on wheels, and that they were very heavy and very tall. And both Jones and McPherson, and even Nolan, Corrections Officer Nolan, testified, these are dangerous jobs. They, you know, people can be injured when these jobs are done. But what did he do? So he, so he failed to do, so he's at the front of this semi, and he's supposed to warn them, and he's supposed to guide the cart down to where the hydraulic lift is. The testimony was very clear that he took this cart and literally just slung it down without any verbal warning. And then at this, and then at the same time, we have McPherson prematurely lowering the gate. Of course, there was also the issue in the record of the lack of the wooden stopper, which is supposed to make sure that the laundry carts don't fly off the gate. They knew that wasn't there as well. And they didn't take any efforts knowing that the wooden stopper wasn't there, took no efforts to deal with that. And there was no efforts knowing that the custom and practice was to announce, I'm going to be bringing this down and to guide it down the he wanted to hurry and get it done. Mr. Tabby, can I ask you about McPherson? So when he, he obviously says he didn't lower the gate, but I think Thomas said at one point in her deposition, he did. And then at another point, he didn't. Did it was, as I understand it, and you correct me if I'm wrong, as I understood reading the depositions, the laundry cart was already starting to fall when he may have started to lower the gate and then appears to have stopped it. Is that accurate? I think, oh, I'm sorry. No, I should have finished it. He didn't, the gate never went all the way down, as I understand, or at least I didn't see that in the testimony. It didn't make it all the way to the ground. But my understanding is that it did begin to lower. And prior to, you know, that, that cart getting on there. Before, so you're saying it got, it lowered before the cart getting on. Right. Okay. Thank you. And so, so again, in answering Judge Moore, you know, I think that's what Jones did. I mean, there was an established procedure that had been done. He acknowledged that, and it wasn't followed in this case. And with respect to McPherson, was there, was there not an indication that he saw that Rhodes was not paying attention? Is that part of the record that he could see that Rhodes was not paying attention, but he continued to let the gate go down? Yes, there was, that was, there was an issue with the district court opinion, and then district court opinion, it talked about whether or not McPherson saw Rhodes, there was a question of, there was the district court pointed out, well, you know, Rhodes was in his blind spot. But then there was also testimony that said, where he said, look, as, as I saw this cart coming down the trailer, I also see Kelly Rhodes. So it's clear there's a question of fact there, that he did see her at the same time that this cart was coming down, whether or not, I don't recall specifically that she wasn't paying attention, or maybe there was something about looking away. But I don't, I don't think there is any indication in the record, nor do I recall the defendant specifically stating that she was somehow negligent or not paying attention, or, and that's the reason why this happened. Mr. Cabot, in your brief, you cite a bunch of compulsion cases, is there any evidence they compelled her to stand there? Because at page 36 of your brief, you say that Jones directed her to stand at the end. But when I looked at all the sites for that, Thomas says, no, I told, I told her to stand there, we rotated and took turns standing there as the carts came down. So I'm just wondering if there's any evidence Jones or McPherson directed her to stand there, and where I can find that in the record. I'm not aware at this point of an order of that. But I do know that that was how this particular loading and unloading process was done. So it's a common practice versus compulsion? Right. And also along those lines, Your Honor, the fact that if, if she was doing something wrong, or if she was not in the correct spot, there's no evidence in the record that McPherson, Jones or anyone else, a prison official for that matter, told her to correct her conduct. And so that that lack of evidence also indicates that they acquiesced and they agreed that she was doing what they expected her to do. Is acquiescence enough? Do you have any cases for that proposition? I don't have any cases that we cited in our brief. But the fact that they, they knowingly saw her, they were aware of what she was doing and didn't correct any of her actions. I think that that shows that they had a duty to certainly corrected if they saw anything wrong. And they didn't do that, Your Honor. If the inmate complained that the weight room has no safety equipment, for example. I'm sorry, you broke up, Your Honor. Oh, my bad. If the inmates complain that the weight room has no safety equipment, and then get injured, lifting weights, would that be subject to the Eighth Amendment? Obviously, if those metal plates fall on your foot or something, it's dangerous, a 45 pound weight or as much as they lift.  Okay. Mr. Cavett, Judge Daugherty here. Are you hearing me? I am, Your Honor. There's some feedback on your end, but I can hear you at this point. Let me just ask a question quickly about the stoppers. Were they normally on these trucks or not? Yes, they were. So why was there not a stopper on this particular occasion? I don't know the answer to that. I don't know if that was ever determined, Your Honor. But I do know that they were aware that there was not a stopper on that day. Thank you, Your Honors. And I see my time is up. Thank you. Court has any questions. Thank you. You'll have your rebuttal time. Thank you. Mr. Farrell. You're on mute now. You need to unmute there. Okay. I couldn't unmute it. Good morning, Your Honors. I'm Jim Farrell. I'm an attorney with the Michigan Attorney General's Office. I represent the appellees in this case. I give a very short statement. The court below got it right. It's a very careful and thorough review of the facts and the law. It's a well-reasoned decision. My contention is this court should hold similarly, and I can address any questions you have. I sat through the depositions. I interviewed most of the people. I could answer your factual questions pretty well if you have any. My understanding is that the district court did find that Jones, that at least there was a genuine issue of material fact vis-a-vis Jones on the on the question about whether the law was clearly established. Is that correct? You're conceding that there is a genuine issue of material fact vis-a-vis Jones. I would agree with that. The allegation that his conduct in shoving, allegedly shoving the laundry bins toward the back, toward the tailgate, was reckless. I don't agree with it. I don't think the evidence supports it. Just to point out, the complaint, it's all couched in terms of negligence. They failed to train. They failed to do this, failed to do that. It's only through her testimony that you get this factual statement that he was flinging the carts. But you listen to Jones. Jones is not a big guy. He said, these carts can weigh 50 to 400 pounds depending on how much clean laundry is loaded in them. He said it took all of his weight and all of his strength to wheel those things from the front of the trailer all the way back to the tailgate or to the lift gate. That they're on caster style wheels. He said those wheels, you can't shove it in a straight line and it will turn. It causes these caster wheels make the thing turn. The way he would do it is he would push and pull these laundry bins out to the lift gate. Once there were two laundry bins on the lift gate, then McPherson, who's standing on the outside with a handheld controller, would announce that he's going to start to lower it. Two of the three laundry porters would stand there with their arms up to steady these bins. The thing would lower down. They would do that. Then when they were done doing that, they would reverse the situation and start loading the truck with dirty laundry. Essentially, the state prison was relying on two women dealing with two carts that weighed up to 400 pounds to steady them. A normal person would not have the strength to stop 400 pounds from moving if they weren't a weightlifter. Nobody assumed that they would do it. In fact, the testimony from one of her co-porters or one of the co-women or one of the other women who was... Prisoners. They're prisoners. The prisoners. The other woman said, we trained her and told her if these things start to tip, get out of the way. In fact, when it did start to tip, they yelled at her and told her to get out of the way. Then why do you have people steadying them if when the minute they start to tip, the people are supposed to get out of the way? That's a good question, Your Honor. I don't know. I'll say this about the lip on those things. On the thing at the back, the lift gate, normally had a lip, a metal lip, but on this particular truck, it didn't have that metal lip. Is the lip at the end where the carts would go off? It was like a metal ledge or a metal bar right there, whatever was going to roll off of it. Where would the normal bar be? By the truck end or by the end that's where people are standing on the ground? Where the people are standing. This one didn't have the lip at the end and it the stopper was what they're talking about. Because this truck didn't have that lip on the end of the tailgate or on the lift gate, the truck driver would use a two-by-four. He'd set a two-by-four out there so it would stop these and prevent the laundry cars from rolling off again. Was that done? Does the record show that was done here? I don't believe it was done here. Jones said he didn't think he was using that two-by-four at this time. He didn't think that was there. Mr. Farrell, Ms. Thomas testified that Jones often pushed the carts quickly and that no prior inmates had been injured. Is that accurate other than maybe scrapes? No, that is that's accurate. I was going to comment on that. The way I'd characterize what happened here was Jones is a kind of all business kind of guy. He wouldn't stop and talk to the prisoners and stop and talk to the CEO. The testimony that he was flinging carts I think is in reality he's a guy who works fast. He would bring the carts out, he'd put them on the thing, walk right back, grab another cart, put it out on the lift gate, turn on. He even testified he did not witness this accident happening because he'd already turned around and walked back to get another cart. There's one other thing I wanted to note for the panel. I don't want to say a it's an auto liability case. Plaintiff filed suit in the state court seeking Michigan no-fault benefits and we settled that claim. We settled all the state law claims of the no-fault claim which is benefits paid without regard to fault. We paid her $50,000 on this case but the plaintiff did not want to resolve these federal civil rights claims and so we couldn't resolve those. We you know this was this is an auto type case. I mean Michigan no-fault law applies to the loading. Mr. Farrell is all that in the record? Yes it is. Okay yeah so if so what is your explanation for why this car tipped? You know I don't know. I think it's you know these I don't know you know plastic edges and they go up about three or four feet. Some of them even go up six feet tall. It could be that the laundry was misloaded. You know this because they're unloading bins with clean laundry in it and the laundry might have been misloaded. The load inside of the bin might have shifted and caused it to tip. The fact that when McPherson lowered it you know he's got a push button handheld controller. Now it says I'm going to lower it and he starts to lower it and that's when it started to tip. It could have been that the lowering itself caused the laundry to shift, caused the thing to tip off, but we don't really know. And you know the thing tipped and the testimony is that she was looking to her left you know and McPherson's on her right. She's wasn't paying attention to the cart in front of her. It started to tip. Thomas I think was helping her. He yelled at her to get out of the way. But interestingly you know she claims that she suffered some additional hearing loss as a result of this skull fracture she got. But she was pretty deaf to begin with and I think she did not hear her co-worker yell at her and tell her to get out of the way. And the thing fell, hit her on the thighs, knocked her to the ground. She hit her head on the side of the pavement. It was a pretty bad injury. I mean they they didn't know if she was going to survive or not. I mean she was bleeding all over the place. They you know they responded immediately. Got her to the hospital right away and all that. But you know I don't want to denigrate what was going on here but it's this is sort of a what one might call a garden variety workplace accident. You know maybe maybe I would say that you know maybe the guy pulling the carts out might have been negligent. I think she was I think Mrs. Rhodes was negligent. You know comparatively negligent. So but I don't there's no evidence. This is in the context of a prison. This is not a context of somebody outside in a laundry service environment. This is and so the question is whether there is something under the Eighth Amendment that is actionable here. And things that you're raising like maybe Ms. Rhodes was hard of hearing to begin with. Wouldn't that go to the question whether there was deliberate indifference in allowing somebody who's hard of hearing to have a job that requires them to hear somebody yelling get out of the way? Well I don't know. Her being hard of hearing I don't recall being in the facts in this record. I don't know if you can point us to somewhere. I probably can't point you to anything. I just know I took your deposition that part of her damage claim was that that the injury exacerbated her hearing loss. And I know that she and we were trying to search for whether she had pre-accident hearing tests and see if she you found any. But no I would I would say this is I don't see evidence of deliberate indifference here. I see evidence of negligence. I don't see deliberate indifference but well don't isn't there a Sixth Circuit case involving somebody who was a prisoner who was working in the prison library who had a hernia and was told nonetheless to move bookcases and such. I'm blanking on the I don't remember that case. I do remember Jones v. Michigan and I read Johnson v. Campbell. I may be messing up which case it is but I think it's Smith versus Yarrow. I'm not familiar with that case. Okay so hypothetically if there is a case that says that an Eighth Amendment claim can be stated when a prisoner is has an ailment that is exacerbated by the work that they are doing in the prison. Wouldn't that principle be applicable here? I don't you know I don't think so because I you know first you have to find deliberate indifference and just an exacerbation of a pre-existing injury you know that can be the result of negligence too and frankly plaintiff allegations in their first amendment complaint are almost all negligence-based type claims. I don't see any that anyone here there's no testimony no evidence that anyone was had inferred a substantial risk of serious injury that people had said that this had never happened before. You know this truck is there Monday through Friday. I mean they do it five times a week. Nobody so there's no no testimony that either of these two defendants Jones or McPherson had inferred that there was a substantial risk of serious injury. Okay so that goes back to that goes back to my question earlier about why have women prisoners at the end of a truck whose job it was to steady the carts which means to prevent the carts from falling over. There's no other reason to steady carts. That's a good question your honor and you know what I don't I don't have an answer for. I mean I frankly I agree with you you know I mean what's the point of them standing there with their you know they're supposedly standing there with their arms up and what are they going to do? They're not going to push a 400 pound cart back onto the lift gate if it starts to tip. You know they're told to get out of the way so what's the point of them even standing there? I don't even know. It sounds fairly I don't know frankly I don't know I can't give you an answer for that. You know if I were in charge I would have I would have done it differently but you know I mean that I don't see that as deliberate. I don't see prison officials you know aware of a substantial risk and then disregarding their risk. I don't see that. Excuse me just a minute. I have something in front of me that indicates that Thomas testified that she had witnessed laundry carts tip over multiple times. Are you telling me now that this has never happened before? The testimony that Jones gave to Pearson was that it never happened before. But what about Thomas's testimony? Well I don't know frankly I don't recall Thomas saying it but the court said she sees it in the record. I can't dispute it that if she said it she said it but according to Jones who delivered this laundry every single day he said he didn't recall these things ever tipping off the back the back end. So even but I'll grant the court this even if it had happened before and you know we don't have any clear record if it had or had not I don't think that makes I don't think that creates any type of awareness or I'm sorry. Mr. Farrell assume it had happened before were there any injuries from it? Not that I'm aware of no sir. Thank you I see your time is up if you want to conclude in a sentence or two. Yeah sure I just I think the court below I think did a you know thoroughly analyze the facts and law applicable to the case. I think the lower court came to the correct conclusion and I would urge the court to in its de novo review to to do the same. Thank you. Thank you. Mr. Cabot. Thank you your honors kind of piggybacking on some of the things that were just recently mentioned regarding the deposition of inmate Thomas. I believe that deposition testimony was on pages 37 and 45 of her deposition where she indicated that this was not the first time a card had fallen off and she also testified that a card had almost fallen off on her as well. So that kind of goes back to that testimony. Any evidence there that there's any injuries from those just out of curiosity? Not that I recall that she testified to I you know I know as far as Thomas she said that it almost fell on her so I she wasn't injured but I don't believe there's any indication that there was actual injury but I don't think that's necessary in a case like this because as we cited on pages 15 and 16 of our principal brief we have Jones himself who acknowledged and this is page id 683 and 684 he acknowledges himself that the loading and unloading of carts was dangerous. So there's already a knowing likelihood of injury that can occur. Even defendant McPherson and I'm looking at page id 715 and 716 he said that these carts posed a substantial risk of harm to inmates and went on to say on page id 722 that an unguided cart which in this case was testified to he didn't take it with his hands and walk it down the trailer like he was supposed to. This was unguided because as inmate Thomas said he flung it. McPherson testified on page id 722 that an unguided cart poses a significant risk of harm to the person receiving the cart and that's why carts were supposed to be guided. So again you have evidence directly from the defendants themselves saying this is dangerous and I think you know I think the district court really went out of its way to to grant summary judgment here and then judge Moore I think the case I quickly pulled it out as you were talking about it I think it was Smith versus Yarrow 78 federal appendix 529 that was a sixth circuit case back in 2003 and basically the court found deliberate indifference in that case where they made an inmate and according to the case from where I quickly looked did have a hernia and he was required to lift things in the library and things and they found look that there was a that was deliberate indifference and that was an issue to be submitted to the jury and so based on our briefing and based on everything your honors I would request respectfully that the decision of the district court be reversed and I see my time is up. Thank you. Thank you both for your argument and the case will be submitted.